IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EDWARD PLASTINO, et al.,           )
                                   )
                    Plaintiff,     )
                                   )
           v.                      )        Case No: 4:12CV1316CAS
                                   )
CHRIS KOSTER, et al.,              )
                                   )
                    Defendants.    )

**SUGGESTIONS IN OPPOSITION TO MOTION
FOR PRELIMINARY INJUNCTION**

Defendant Chris Koster for his Suggestions in Opposition to Plaintiffs'

Motion for Preliminary Injunction (Doc. #26), states as follows:

Whether a preliminary injunction should issue involves the

consideration of four factors: (1) the threat of irreparable harm to the movant;

(2) the state of the balance between this harm and the injury that granting

the injunction will inflict on other parties litigant; (3) the probability that

movant will succeed on the merits; and (4) the public interest. *Vonage*

*Holdings Corp. v. Nebraska Public Service Comm'n,* 564 F.3d 900, 904 (8th

Cir. 2009) (citing *Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114

(8th Cir.1981)).

A preliminary injunction is "an extraordinary remedy." *Watkins, Inc. v.*

*Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).  A district court has broad discretion

when ruling on preliminary injunction requests. *CDI Energy Services v. West River Pumps, Inc.*, 567 F.3d 398, 401 (8th Cir. 2009). Accordingly, the party seeking a preliminary injunction bears "the complete burden of proving that a preliminary injunction should be granted." *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### 1. Plaintiffs have not shown a likelihood of success on the merits.

Plaintiffs have failed to demonstrate that they are likely to succeed on the merits. First, as was argued by Defendant Neer in his opposition to Plaintiffs motion for a preliminary injunction, Plaintiff Second Amendment Foundation ("SAF") lacks associational standing. (Doc. 28 at 3-4.) Defendant Koster joins this argument and requests that the Court hold that SAF lacks standing and thus is not likely to succeed on the merits of its claims. Second, Plaintiffs are unlikely to succeed on the merits of their Second Amendment claims because the right to concealed carry is not a right encompassed by the Second Amendment. Finally, Plaintiffs are unlikely to succeed on the merits of their Equal Protection claims because permanent resident aliens are not similarly situated to United States citizens for purposes of evaluating a concealed carry certification application.

### A. The Second Amendment does not protect concealed carry.

Plastino alleges that the denial of a concealed carry certification infringes upon his Second Amendment rights to keep and bear arms. This

allegation misreads the Second Amendment. "For example, the majority of the 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (internal citations omitted). The implication of the Supreme Court's statement is that concealed carry is not within the scope of the Second Amendment (or at the least that that is the presumption). *See, e.g.*, Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L. Rev. 1343, 1359 (2009) ("This appears to be  an endorsement of yet another exception to the constitutional right."); *Hightower v. City of Boston*, 693 F.3d 61, 73 (1st Cir. 2012) (interpreting this language to mean that laws prohibiting the carrying of concealed weapons are an example of presumptively lawful restrictions); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1523-24 (2009). *See also Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (stating in dicta that Second Amendment right "is not infringed by laws prohibiting the carrying of concealed weapons").

Moreover, the Missouri Constitution notes that although the right to keep and bear arms is protected, "this shall not justify the wearing of concealed weapons." Mo. Const. Art. 1 § 23. This language was added in 1875,

apparently because of concern about a Kentucky case finding a concealed carry right. *See* David B. Kopel, The Licensing of Concealed Handguns for Lawful Protection: Support from Five State Supreme Courts, 68 Alb. L. Rev. 305, 309 (2005). Thus, in Missouri, there has not been a generalized recognition of a protected right to concealed carry. The Missouri Supreme Court has determined that "the General Assembly . . . has the final say in the use and regulation of concealed weapons." *Brooks v. State*, 128 S.W.3d 844, 847 (Mo. 2004).

Therefore, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their Second Amendment claims and the Court should deny a preliminary injunction on these claims.

> B. <u>Plastino has failed to demonstrate a likelihood of success on the merits of his Equal Protection claim.</u>

Plaintiffs do not differentiate between their Second Amendment claims and their claims under the Equal Protection Clause. Instead, Plaintiffs cite generally to alienage cases and suggest that denying a concealed carry endorsement on the basis of citizenship is per se improper.

This argument misunderstands the compelling governmental interest in protecting the safety of the public. The federal government has recognized the compelling governmental interest in preventing certain individuals from obtaining or possessing firearms. Under 18 U.S.C. § 922(g), it is unlawful for

any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" (i.e., convicted of a felony) to possess or transport any firearm or ammunition in interstate or foreign commerce. The statute goes on to set forth additional factors, including dishonorable military discharge, renunciation of citizenship, crimes involving intoxicating substances, judgments of mental incompetence, and other factors. The statute's stated purpose is "make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime." S.Rep. No. 90–1097, at 22 (1968), 1968 U.S.C.C.A.N. 2112, 2113–14.

Here, Missouri attempts to obtain similar information to the factors set forth in Section 922(g) before issuing a concealed carry endorsement. It is reasonable to assume that the General Assembly has similar compelling reasons to restrict concealed carry as does the federal government to restrict firearms and ammunition in interstate commerce.

The General Assembly has chosen to regulate concealed carry more strictly than open carry. This determination has nothing to do with Second Amendment rights (which, as discussed above, are not affected by concealed carry regulations). Indeed, the General Assembly may recognize that

5

concealed carry can pose more of a danger to public safety than open carry. For example, during a law enforcement stop, an individual without a concealed carry endorsement may only transport weapons in open view or in a glove box, not concealed on his or her person. If a person has a concealed carry endorsement, a weapon may be immediately at hand. To protect the law enforcement agent, the General Assembly requires that a person be reviewed for criminal history and other factors by the local sheriff before being permitted to conceal a weapon on his or her person.

Moreover, the General Assembly requires that before a concealed carry certification is issued, the local sheriff perform an individualized review of applicant. The statute sets a minimum age, a residency requirement, certain requirements related to criminal history, an analysis of behavior as documented in public records, an examination of judgments as to mental competence, a firearms safety course requirement, and a determination that the individual is not subject to a full order of protection. *See generally* §§ 571.101.2(1)-(7), (10), RSMo.

When reviewing an application for a concealed carry endorsement, sheriffs generally consult the National Crime Information Center ("NCIC") index of computerized criminal justice information. The NCIC provides data related to criminal record history information, fugitives, stolen property, missing persons, and orders of protection. But this database contains only

6

information related to criminal history within the United States and open

warrants in foreign jurisdictions that choose to report information. The NCIC

does not reveal criminal history such as felony convictions or guilty pleas.

Nor will this index reveal relevant convictions related to intoxicating

substances that may have occurred outside the United States.[1] The General

Assembly may have recognized that obtaining a full criminal history for a

permanent resident alien would be more expensive and more difficult than

obtaining a similar evaluation of a citizen.

     Indeed, there are citizenship restrictions on certain federal jobs where

security or background checks are required. For example, the Department of

Justice prohibits non-citizens from working for Interpol Washington, for

United States Attorneys' Offices, and for the Executive Office for

Immigration Review. In these instances, the federal government has

determined that security concerns are sufficient to restrict the jobs to

citizens.

     Because concealed carry is not a right protected by the Second

Amendment and because there is a compelling governmental interest in

protecting the safety of the public, the General Assembly is entitled to

---

[1] The Court may take judicial notice of the NCIC information. For a list of the twenty-one files maintained by the NCIC, see http://www.fbi.gov/about-us/cjis/ncic/ncic_files (accessed Feb. 5, 2013). A copy of this listing is attached to this motion as Exhibit A.

regulate concealed carry endorsements in ways that further public safety. Here, by restricting the endorsement to citizens, the General Assembly may have recognized the difficulty in obtaining complete criminal history from foreign jurisdictions. Indeed, the local sheriffs' offices would have no reasonable way to evaluate the relevant factors for foreign jurisdictions, many of which do not provide such information in a readily accessible manner.

**2.  Plaintiffs have not shown irreparable harm.**

Plaintiffs argue that continued enforcement of the concealed carry restrictions causes them irreparable harm. But Plaintiffs have failed to demonstrate a likelihood of success on the merits on their claims. They have also failed to demonstrate that the restrictions on concealed carry cause irreparable harm to their ability to engage in self-defense. Plaintiffs are entitled to openly carry weapons and to legally keep weapons within residences. The fact that they fear prosecution under the statute should they choose to defy the law does not demonstrate irreparable harm.

**3.  There is harm to the State and the public interest will not be served.**

Plaintiffs' suit changes the status quo.  An injunction would require the county sheriffs to begin processing concealed carry applications for non-citizens. Performing analysis of the criminal history of such applicants will

8

cost money and time of public officials. Moreover, to the extent that concealed carry certifications are granted during the pendency of the lawsuit, they would need to be reversed again if Plaintiffs are ultimately unsuccessful. Requiring such endorsement followed by potential unendorsement is an unnecessary bureaucratic hassle. Instead, the Court should maintain the status quo during the pendency of the litigation.

Furthermore, to the extent that concealed carry endorsements are improperly granted to individuals deemed by the General Assembly not to be appropriate for such endorsement, there is an additional risk to the public. The General Assembly has considered the qualifications necessary to obtain the endorsement. This determination weighs public safety concerns and should be granted deference in the context of a preliminary injunction.

## Conclusion

For all of the reasons stated above, and for the reasons stated in Defendant Neer's Suggestions in Opposition to Plaintiffs' Motion for a Preliminary Injunction, which Defendant Koster joins, Plaintiffs have failed to demonstrate any of the relevant *Dataphase* factors for the issuance of a preliminary injunction. Therefore, Defendant Koster respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

CHRIS KOSTER
Attorney General

*/s/ Joanna Trachtenberg*

JOANNA TRACHTENBERG
Assistant Attorney General
Mo. Bar. No. 63298
P.O. Box 899
Jefferson City, MO 65102
Phone (573) 751-8869
Fax (573) 751-9456
E-mail:
Joanna.Trachtenberg@ago.mo.gov

ATTORNEY FOR DEFENDANT
CHRIS KOSTER

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 6th day of February, 2013, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

David G. Sigale
739 Roosevelt Road
Suite 304
Glen Ellyn, Illinois 60137

Matthew Singer
6963 Waterman
St Louis, Missouri 63130

Robert Hoeynck, Jr.
Toby Dible
St. Charles County
Counselor Office
100 North Third Street
Suite 216
St. Charles, Missouri 63301


　　　　　　　　　　　　　　　　*/s/ Joanna Trachtenberg*
　　　　　　　　　　　　　　　　Assistant Attorney General

11