# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| EDWARD F. PLASTINO and ) | |
| SECOND AMENDMENT FOUNDATION, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 4:12-CV-1316 |
| ) | |
| CHRIS KOSTER, in his Official Capacity as ) | |
| Attorney General of the State of Missouri; and ) | |
| TOM NEER, in his Official Capacity as ) | |
| Sheriff of St. Charles County, Missouri, ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

NOW COME the Plaintiffs, EDWARD F. PLASTINO and SECOND AMENDMENT FOUNDATION, INC., by and through undersigned counsel, and for their Reply to Defendants' Responses to their Motion for Preliminary Injunction, state as follows:

Dated: February 21, 2013           Respectfully submitted,

David G. Sigale, Esq. (#6238103 (IL))   Matthew T. Singer, Esq. (MO ED Fed No.5262301)
LAW FIRM OF DAVID G. SIGALE, P.C.   THE LAW OFFICE OF MATTHEW T. SINGER
739 Roosevelt Road, Suite 304           6963 Waterman Avenue
Glen Ellyn, IL 60137                             St. Louis, MO 63130
630.452.4547                                       (314) 272-3388
dsigale@sigalelaw.com                      MTSinger@MTSinger.com
Admitted *pro hac vice*

                                   By:         /s/ David G. Sigale                    
                                               David G. Sigale

                                   One of the Attorneys for Plaintiffs

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### *PRELIMINARY STATEMENT*

Defendants' Responses offer nothing to refute that Plaintiffs are entitled to a preliminary injunction.  Plaintiff SAF has organizational standing, and in any event Plaintiff Plastino has standing to bring his claim.

Defendants further attempts to argue that the concealed carrying of firearms for self-defense is not a Second Amendment right, and that  lawful resident aliens are less entitled to constitutional protection, when in fact the opposite is true; they are a protected class for equal protection purposes.  Further, concealed carry is not the specific issue here; it is the right of public carry that is denied to a protected class for no reason other than discrimination, justified by nothing than pretense.

Defendant Koster seems to be making a bureaucratic argument that would in no way serve as a justification for discrimination, and in no way salvages the statute, as the alleged difficulties with finding out about criminal acts committed outside the country also applies to traveling citizens, so the same apparent lack of concern as to citizens should also be applied to Plaintiffs.  Further, Missouri allows open carry by lawful resident aliens, so the alleged concern is far too hollow to meet constitutional muster.

Defendant then argues Plaintiffs are not entitled to equal protection of the law at issue, wrongly arguing that the prohibition at issue does not implicate the Second Amendment

Further, the Plaintiffs have shown the irreparable harm necessary for a preliminary injunction.  They are (1.) the deprivation of constitutional rights; (2.) the potential injury and death from being unable to avail themselves of core Second Amendment rights; and (3.) the threat of criminal prosecution for attempting to engage in constitutionally-protected activity.

Therefore, a preliminary injunction against the enforcement of § 571.101.2(1) RSMo should be granted.

## ARGUMENT

**SAF has organizational standing.**

Defendants first incorrectly argue SAF lacks organizational standing. It is true that ". . . an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Terre Du Lac Association v. Terre Du Lac, Inc.*, 772 F.2d 467, 470 (8th Cir. 1985). Neer argues SAF fails to meet the third prong, but there is nothing about Plaintiffs' claims that require individual participation.

In *Terre Du Lac*, organizational standing was denied to a property owner's association in its claim against a developer because "[a] damages remedy for a Land Sales Act violation would clearly require individualized proof necessitating the individual participation of the Association members." *Id.* at 471. The *Terre Du Lac* Court cited to *Associated General Contractors v. Otter Tail Power Co.*, 611 F.2d 684, 689-90 (8th Cir. 1979) (associational standing is traditionally denied in section 4 antitrust actions, which seek treble damages awards, due to the need for "precise knowledge of the * * * injury to each plaintiff", whereas in section 16 antitrust actions, which seek injunctive relief, associational standing is not denied unless the association is an inappropriate representative for some reason). *Terre Du Lac*, 772 F.2d at 471.

Here, the Plaintiffs are seeking injunctive and declaratory relief. The Plaintiffs are law-abiding permanent resident aliens who would otherwise qualify for a concealed carry permit but

3

for the illegal discrimination against their alienage.  There is nothing individualized about their claims, and SAF is well in the position to represent their interests.

Further, Neer seems to be arguing that the Court should not accept that Plastino is a member of SAF, because SAF's Declaration does not say so, even though Plastino's Declaration, and the pending Amended Complaint, both state this fact.  However, it is irrelevant whether both SAF and Plastino say that Plastino is a member; the fact has been established.  Neer cites to *Fletcher v. Haas*, but in *Fletcher* the named plaintiffs were apparently not members of the organizations.  In the absence of any other proof of members, the District Court found the groups did not meet the *first* prong of standing.  Here, the first prong is met, but Neer seems to be using the allegation to try and disprove the third prong.  Neer is not accurate in his factual assertions, and his mixing-and-matching of the standing elements lacks merit.

**Since Plastino has standing, the issue of SAF's standing is irrelevant to determining the merits of the Plaintiffs' claim.**

As the Seventh Circuit noted in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), "Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not." *Id.* at 696, fn.7.   Plastino has standing, so the argument over whether SAF has standing is a moot point.

**The Second Amendment protects public carrying of firearms; therefore there is a Second Amendment right at stake.**

Despite the Defendants' arguments, and though the Supreme Court has not weighed in on concealed carry, the rulings of other Courts show the Second Amendment applies to this case, and therefore near strict scrutiny applies to the State's actions.

*District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), altered the legal landscape as to Second Amendment analysis, and in

4

many instances the viability, of Second Amendment claims.  That alteration is becoming evident throughout the Court system, including as to permanent resident aliens.

In 2012, at least five federal Courts have held that there is a constitutional right to the public carrying of firearms.  The Seventh Circuit recently ruled in *Moore v. Madigan¸* 702 F.3d 933 (7th Cir. 2012), that an Illinois ban on the public carrying of firearms is unconstitutional, as the Second Amendment right of bearing arms for self-defense extends outside of the home.

Also, District Courts across the country have specifically held that the Second Amendment confers rights that extend beyond the home.  *See Woollard v. Gallagher*, 2012 U.S. Dist. LEXIS 28498 (D.Md, March 2, 2012) (striking down Md. Public Safety Code § 5-306(a)(5)(ii), requiring "good and substantial reason" to carry concealed handgun); *See also United States v. Weaver*, 2012 U.S. Dist. LEXIS 29613 (S.D.W.V., March 7, 2012); *See also Bateman v. Perdue*, 2012 U.S. Dist. LEXIS 47336, at *10-*11 (E.D.N.C. March 29, 2012) ("Although considerable uncertainty exists regarding the scope of the Second Amendment right to keep and bear arms, it undoubtedly is not limited to the confines of the home." (striking down North Carolina's prohibition on the carrying of handguns during declared state emergencies)).

The Supreme Court "read the [Second Amendment's] operative clause to 'guarantee the individual right to possess and carry weapons in case of confrontation.'" *United States v. Rene E.*, 583 F.3d 8, 11 (1st Cir. 2009) (quoting *District of Columbia v. Heller*, 554 U.S. at 592 (italics added)).  *See also Weaver*, 2012 U.S. Dist. LEXIS 29613 at *13 (citing *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) (recognizing Heller's notation that the right to keep and bear arms was understood by the founding generation to encompass "self defense and hunting" as well as militia service); also citing *Heller*, 554 U.S. at 594 (stating that, by the time of the founding, the right to have arms was "fundamental" and "understood to be an individual right

5

protecting against both public and private violence.")). The *Heller* Court additionally mentioned militia membership and hunting as key purposes for the existence of the right to keep and bear arms. *See Heller*, 554 U.S. at 598; *See also United States v. Masciandaro*, 638 F.3d 458, 467-68 (4th Cir. 2011), *cert. den.*, 132 S.Ct. 756 (U.S. Nov. 28, 2011) (Niemeyer, J., writing separately as to Part III.B.).

The *Weaver* Court found entirely persuasive Judge Niemeyer's dissent on *Masciandaro*, particularly for its analysis of the broader holdings of *Heller*, and agreed and adopted Judge Niemeyer's conclusion that "the general preexisting right to keep and bear arms for participation in militias, for self-defense, and for hunting is thus not strictly limited to the home environment but extends in some form to wherever those activities or needs occur . . ." *Weaver*, 2012 U.S. Dist. LEXIS 29613 at *13 (citing *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., writing separately as to Part III.B.)).

Plaintiffs testified in their Declarations they do not wish to always carry firearms openly, and it is obvious that there are situations where someone may wish to have a firearm for protection, yet not advertise that fact. Further, Plaintiffs testify they refrain from carrying concealed due to fear of criminal penalties. They have shown that are suffering discrimination under the law, and that there is no constitutional basis for doing so. Neither of the Defendants' Responses, nor the alleged justifications for the discrimination, change that conclusion.

**Plaintiffs are likely to succeed on the merits, because even though the State can regulate the manner of public carrying, it may not discriminate against lawful resident aliens in implementing the manner it has chosen.**

". . . [T]he Fourteenth Amendment's Equal Protection Clause prohibits government officials from selectively applying laws in a discriminatory way motivated intentionally or purposefully by a prohibited characteristic, such as race or ethnicity." *Dorr v. Weber*, 741 F.

6

Supp. 2d 993, 1006-1007 (N.D. Iowa 2010) (citing *Brandt v. Davis*, 191 F.3d 887, 893 (8th Cir. 1999); *Central Airlines, Inc. v. United States*, 138 F.3d 333, 334-35 (8th Cir. 1998)).[1]

"To prove an equal protection claim, a plaintiff must show (1) that he or she was singled out and treated differently from persons similarly situated, and (2) that the plaintiff was singled out on the basis of a prohibited characteristic, such as race." *Dorr v. Weber*, 741 F. Supp. 2d 993, 1007 (N.D. Iowa 2010) (citing *Ellebracht v. Police Bd. of Metro. Police Dep't of St. Louis*, 137 F.3d 563, 566 (8th Cir. 1998)).

Plaintiffs have shown that, as a protected class, their equal protection claims should be evaluated using strict scrutiny, and indeed this is well-settled law. *See Graham v. Richardson*, 403 U.S. 365, 372 (1971); *See also United States v. Carolene Products Co.*, 304 U.S. 144, 152-153, n. 4 (1938)); *See also Nyquist v. Mauclet*, 432 U.S. 1 (1977) (discrimination against aliens in state financial assistance for higher education violated failed to meet strict scrutiny burden of Equal Protection Clause). Neer argues that Plaintiffs did not make the strict scrutiny standard clear in their opening Memorandum, *but see* pp. 6, 7 of Plaintiffs' Memorandum in Support. Further, because the Defendants' prohibition implicates the Second Amendment, near strict scrutiny must be applied in evaluating the statute's constitutionality. In this case, since the Defendants' ban neither furthers a compelling State interest nor is the least-restrictive means to reach any such claimed interest, the prohibition must be enjoined.

As noted above, public carrying of firearms or self-defense is fundamentally protected by the Second Amendment. Of course, the State is allowed certain constitutional regulations of the right to carry arms, including the manner of carrying. The two obvious choices are concealed

---

[1] Neer cites to *Dorr* to argue against the Second Amendment right of public carrying, but *Dorr* pre-dates *McDonald*, which held the Second Amendment is incorporated to the states through the Fourteenth Amendment. Further, *Dorr* pre-dates *Moore*, *Ezell*, and all the other 2012 cases cited in this Reply that the Second Amendment protects a right to bearing arms in public.

7

and open carrying. Virtually all states allow concealed carry. A few allow open carry. Missouri allows both. As this is how the State legislature has chosen to regulate the manner of exercising the Second Amendment, that regulation must be applied in a constitutionally equal manner to its law-abiding citizens.

Applying strict or near-strict scrutiny, Defendants have offered no real evidence, or even any plausible excuses, why lawful resident aliens are subjected to disparate treatment. *See Graham*, 403 U.S. at 377. Further, Defendants do not even deny that is what they are doing. Rather, Neer argues dismissively that Plaintiffs are required to prove the law is not arbitrary or related to a "legitimate" governmental interest (*See* p.6 of Neer's Response). Besides the fact that "legitimate" is not the standard, and that Defendants must show something on the order of a compelling state interest, the Plaintiffs have shown that there is **no** governmental interest involved (since discrimination is not a governmental interest), and that the entire discriminatory scheme is arbitrary.[2]

The reasons no logical rationale can even be offered are: (1.) permanent resident aliens seeking a concealed carry permit would still have to successfully complete and qualify under the statutory application process, and (2.) the State considers permanent resident aliens trustworthy enough to possess and carry firearms in many other contexts. Defendant Koster's concerns about foreign background checks apply equally to citizens and lawful resident aliens, and are no basis for discrimination.

Defendants argue that they may grant concealed carry endorsements to some (citizen-residents) but not others (permanent resident aliens). If the "others" in Defendants' argument

---

[2] Koster asserts public safety is a compelling state interest, but the wholesale discrimination engaged in by the State is not a restrictive means, let alone the "least" restrictive. Further, as a categorical ban, the statute should not even be analyzed using levels of scrutiny.

8

included the mentally ill, violent felons, or illegal aliens (the rights of none of these being at issue in this case), Defendants' argument may hold water. But the "others" in this case, who Defendants so cavalierly dismiss, are law-abiding residents entitled to constitutional rights, *including* the Fourteenth Amendment's guarantee of equal protection of the laws. The State does not have the prerogative to enact concealed carry and then ban it as to a group of law-abiding residents without reason or rationale.

While the Defendants would likely concede that permanent resident aliens, such as Plastino and SAF's applicable members, are generally entitled to equal protection of the laws under the Fourteenth Amendment, they argue Plaintiffs are not entitled to equal protection of the law at issue. They make references to police power and protecting the public, and the alleged "harm to the State." (*See* p.8 of Koster's Response.) But these alleged justifications are not supported by any actual evidence or proof; indeed, it is impossible to justify why permanent resident aliens may carry firearms in their home, on their property, and openly in public, but why banning them from carrying concealed furthers public safety. Defendant Koster does not even try, claiming that "[t]he General Assembly may have recognized that obtaining a full criminal history for a permanent resident alien would be more expensive and more difficult than obtaining a similar evaluation of a citizen." *See* p.7 of Koster's Response.

Besides being completely speculative and unsupported by fact, the argument is outdated in 2013, in a State that protects Second Amendment rights and the equal rights of its residents. Missouri has decided that citizens may carry concealed firearms, and not unregulated. The bearer must obtain a concealed carry license pursuant to Missouri Statute § 571.101 RSMo, and comply with all requirements therein, including completing a firearms training course (*See* Missouri Statute § 571.111.1. RSMo; Missouri Statute § 571.101.2(10) RSMo). The applicant

must be fingerprinted and pass a national criminal background check. *See* Missouri Statute § 571.101.5 RSMo.

In contrast, it is the open carry of firearms that the legislature has allowed to be unregulated, including for permanent resident aliens. Therefore, whatever vague police power or public safety interest the Defendants are claiming in denying Plaintiffs equal protection, it is disingenuous when the State obviously allows permanent resident aliens all the other types of firearms carrying without police power or public safety concerns. The Defendants offer no reason why permanent resident aliens residing in Missouri, who are trustworthy to carry firearms in their home, on their property, and openly in public places, are a danger to society if allowed to carry concealed. The Defendants' Responses address none of this.

Further, the Responses do not address why citizens who travel abroad are not denied concealed carry permits, since hypothetically they could commit crimes that would slip through a background check. Koster acknowledges that the NCIC database contains 21 files, including the Foreign Fugitive File, which contains: "Records on persons wanted by another country for a crime that would be a felony if it were committed in the United States." The NCIC database also contains the Immigration Violator File, which contains: "Records on criminal aliens whom immigration authorities have deported and aliens with outstanding administrative warrants of removal."

Defendant Koster argues that equal protection to legal aliens does not extend to where there are "security concerns" (*See* p.7 of Koster's Response), but that is clearly revealed to be a misstatement of equal protection law. In *Bernal v. Fainter*, 467 U.S. 216 (1984), a citizenship requirement to be a notary public in Texas was struck down. Though the Court described a "political function" exception to the alienage strict scrutiny requirement, that was found to apply

10

only to ". . . to laws that exclude aliens from positions intimately related to the process of democratic self-government." *Id.* at 220.  The examples Koster cites (Interpol Washington, U.S. Attorney's Office, Executive Office for Immigration Review) arguably fall into the "political function" exception, but not because of some vague and amorphous security concern.  Of course, *Bernal* was a pre-*Heller* decision.  The bearing of firearms, as important a right as it is, does not fall into the democratic process/political function category.  Strict scrutiny still applies in this case, which Defendant cannot overcome.

The case of *Sugarmann v. Dougall*, 413 U.S. 634 (1973), is instructive in this regard.  In *Sugarmann*, plaintiffs challenged a New York City ban on federally-registered resident aliens working in competitive civil service positions.  The Court struck the ban down, in part because:

> It is at once apparent, however, that appellants' asserted justification proves both too much and too little. As the above outline of the New York scheme reveals, the State's broad prohibition of the employment of aliens applies to many positions with respect to which the State's proffered justification has little, if any, relationship. At the same time, the prohibition has no application at all to positions that would seem naturally to fall within the State's asserted purpose. Our standard of review of statutes that treat aliens differently from citizens requires a greater degree of precision. *Id.* at 642.

This fits the current situation directly, where one type of firearm possession is banned to aliens while others are open, and with no offered compelling interest as to why.  Therefore, because the State has chosen to regulate the Second Amendment right of the public carrying of firearms by enacting regulatory schemes of unpermitted open carrying and permitted concealed carrying, the State may not deny this right to certain classes of residents entitled to this constitutional right, such as lawful permanent residents.

Courts have addressed this issue and repeatedly come down on the side of the lawful aliens and against fear-mongering discrimination, including the specific application of the Fourteenth Amendment's Equal Protection Clause to aliens in the context of firearms. Aliens are considered a suspect class, as noted, for example, in *People v. Rappard*, 28 Cal. App. 3d 302, 304 (Cal. App. 2d Dist. 1972). In *Rappard*, an alien was convicted of being in possession of a concealable firearm. He successfully challenged his conviction under the Equal Protection Clause. The Court held:

> Since classifications based upon alienage, like those predicated upon nationality or race, are inherently suspect and subject to close judicial scrutiny, we must invoke the following strict standard when reviewing a discriminatory statute based upon alienage: 'Not only must the classification reasonably relate to the purposes of the law, but also the state must bear the burden of establishing that the classification constitutes a necessary means of accomplishing a legitimate state interest, and that the law serves to promote a compelling state interest.'

*Rappard*, 28 Cal. App. 3d at 304.

In striking down the law at issue, the Court wrote: "In short, the classification of the statute -- alienage -- has no reasonable relationship to the threat to public safety which Penal Code section 12021 was ostensibly designed to prevent. Any classification which treats all aliens as dangerous and all United States citizens as trustworthy rests upon a very questionable basis." *Id.* at 305. While *Rappard* may not bind this Court, it is instructive in its similarities.

A similar result was reached in *State v. Chumphol*, 97 Nev. 440 (Nev. 1981), where the Court stated: "A person does not exhibit a tendency toward crime merely because he or she is a noncitizen. *See Raffaelli v. Committee of Bar Examiners*, 496 P.2d 1264 (Cal. 1972). As the California Supreme Court noted in that case, classification based upon alienage 'is the lingering

vestige of a xenophobic attitude which . . . should now be allowed to join those [other] anachronistic classifications among the crumbled pedestals of history.'" *Id.* at 442.

This case is also directly on point with the pre-*Heller* and pre-*McDonald* case of *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152 (3d Cir. Del. 1981). In *Hetherton*, the Court stated:

> The essence of Sears' argument is that the § 904 requirement of two freeholder witnesses to the sale of a deadly weapon bears no rational basis to Delaware's legitimate interest in having purchasers positively identified and in deterring ex-felons, such as Fullman, who are not permitted to purchase firearms in Delaware, from buying guns. Hetherton counters that, since Delaware can totally ban the sale of firearms, non-freeholders are not being deprived of a right. Further, he contends the two freeholder requirement is rational in that it results in a more burdensome procedure for the purchase of weapons.
>
> Hetherton's argument that Delaware has created no right to purchase firearms is misconceived. While it may be true that Delaware could ban the sale of all deadly weapons, it does not follow that the State, having abrogated its power to effect a total ban, can arbitrarily establish categories of persons who can or cannot buy the weapons. Clearly, Delaware could not limit the sale of firearms to men only or to members of certain religious groups. The question then is whether it is rational for Delaware to limit sales to persons who know two Delaware freeholders and can produce them as witnesses. We think that this question must be answered in the negative.

*Hetherton*, 652 F.2d at 1157-1158.

That Missouri does not deny or revoke permits of international travelers shows that this concern is not as important as Defendant Koster would have the Court believe. If Defendant argues that the "international traveler" scenario is speculative and remote, Plaintiffs point out that so is the lawful permanent resident scenario. The only difference is that the lawful aliens are actually suffering discrimination as a result of this pretense.

13

**<u>Plaintiffs have suffered multiple irreparable harms.</u>**

Defendants also argue Plaintiffs have not suffered irreparable harm because they only "fear" prosecution for bearing concealed arms for self-defense without a concealed carry endorsement. However, the Supreme Court has stated:

> "It often happens that courts are unwilling to grant injunctions to restrain the enforcement of penal statutes or ordinances, and relegate the plaintiff to his option, either to violate the statute and take his chances in testing constitutionality on a criminal prosecution, or else to [forgo], in the fear of prosecution, the exercise of his claimed rights. Into this dilemma no civilized legal system operating under a constitution should force any person. The court, in effect, by refusing an injunction informs the prospective victim that the only way to determine whether the suspect is a mushroom or a toadstool, is to eat it. Assuming that the plaintiff has a vital interest in the enforcement of the challenged statute or ordinance, there is no reason why a declaratory judgment should not be issued, instead of compelling a violation of the statute as a condition precedent to challenging its constitutionality.

*Steffel v. Thompson*, 415 U.S. 452, 468 (1974) (quoting Hearings on H. R. 5623 before a Subcommittee of the Senate Committee on the Judiciary, 70th Cong., 1st Sess., 75-76 (1928); *See also* E. Borchard, Declaratory Judgments x-xi (2d ed. 1941).

However, the issue of whether Plaintiffs need to get themselves arrested before bringing suit is a red herring. This case is about much more than the right to not be unreasonably and wrongfully subjected to criminal prosecution, although that is of course intertwined with the deprivation of Plaintiffs' constitutional rights; the attempted exercise of which is what would subject Plaintiffs to said prosecution. Neer's Response ignores the well-settled truism that even the temporary deprivation of Constitutional rights is irreparable harm. This is just as true in Second Amendment cases as it is for First Amendment freedom of speech cases or Fourth Amendment false arrest cases. That is why Plaintiffs satisfy this element.

**Because municipalities and counties in Missouri can opt-out of the open carry scheme, the argument that open carry should somehow be enough for legal aliens has no merit.**

While the State allows lawful resident aliens the right of open carry, a further review of state law reveals that the "right" of open carry is far more tenuous that Defendants would have the Court believe. Missouri Statute § 21.750.3 RSMo specifically deals with statewide preemption of firearms law, but grants an exception for open carry. Specifically, the statute states:

> 3. Nothing contained in this section shall prohibit any ordinance of any political subdivision which conforms exactly with any of the provisions of sections 571.010 to 571.070, with appropriate penalty provisions, or which regulates the open carrying of firearms readily capable of lethal use or the discharge of firearms within a jurisdiction, provided such ordinance complies with the provisions of section 252.243.

Therefore, municipalities are allowed to regulate, including opt-out, of allowing open carry, so far as they do not run afoul of laws regarding designated hunting heritage protection areas. This is hardly the protection of the Second Amendment right to bear arms for self-defense that Koster represents lawful resident aliens enjoy.

For example, in St. Charles County, Cottleville Municipal Code Section 210.250.A.6 bans open carry of firearms, although there is an exception in 210.250.D. if one has a concealed carry endorsement. Foristell, Missouri is the same (*See* Foristell Municipal Code Section 210.240.A.4 (open carry banned); Section 210.240.C. (exception for concealed carry endorsement holder)). O'Fallon, Missouri has the same law (*See* O'Fallon Municipal Code Section 215.250.A.6 (open carry banned); Section 215.250.D. (exception for concealed carry endorsement holder)).

In St. Louis County, for example, Bella Villa Municipal Code Section 210.250.A.6 bans open carry of firearms, although there is an exception in 210.250.D. if one has a concealed carry

15

endorsement. Berkeley, Missouri has the same laws. So does Breckenridge Hills and Cool Valley. Ellisville and Fenton do not appear to allow open carry at all.

Likewise in St. Louis, where the City's relevant ordinance states:

> 15.130.040 Exposed in whole or in part.: No person, in any place of public accommodation or at any public gathering or on any public property, street or thoroughfare, shall carry on or about his person, any firearm, pistol, revolver, shotgun, rifle or springback knife, or other weapon proscribed under Section 564.610 Missouri Revised Statutes, exposed in whole or in part to view.

These are just ten examples in two counties, but they clearly show that any argument of Defendants predicated on the notion that lawful resident aliens have the Second Amendment right of public carrying because they are allowed to carry openly is wrong.

## CONCLUSION

Missouri cannot deny Second and Fourteenth Amendment rights to an entire class of its residents, especially a constitutionally-protected class. Plaintiffs have met the four required elements for a preliminary injunction, pursuant to *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) and *Sierra Club v. United States Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011). Therefore, Plaintiffs respectfully request that the motion for preliminary injunctive relief be granted.

Dated: February 21, 2013                    Respectfully submitted,

David G. Sigale, Esq. (#6238103 (IL))       Matthew T. Singer, Esq. (MO ED Fed No.5262301)
LAW FIRM OF DAVID G. SIGALE, P.C.           THE LAW OFFICE OF MATTHEW T. SINGER
739 Roosevelt Road, Suite 304               6963 Waterman Avenue
Glen Ellyn, IL 60137                        St. Louis, MO 63130
630.452.4547                                (314) 272-3388
dsigale@sigalelaw.com                       MTSinger@MTSinger.com
Admitted *pro hac vice*

                                            By:  _____/s/ David G. Sigale_____
                                                      David G. Sigale

                                            One of the Attorneys for Plaintiffs

**CERTIFICATE OF ATTORNEY AND NOTICE OF ELECTRONIC FILING**

The undersigned certifies that:

    1.    On February 21, 2013, the foregoing document was electronically filed with the District Court Clerk *via* CM/ECF filing system;

    2.    Pursuant to F.R.Civ.P. 5, the undersigned certifies that, to his best information and belief, there are no non-CM/ECF participants in this matter.

                              /s/ David G. Sigale
                             One of the Attorneys for Plaintiffs